**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**-vs-**  Case No.  6:13-cr-150-Orl-36KRS

**HUSEIN KERMALI**

_____

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT:**

This cause came on for consideration after an evidentiary hearing on the following motion filed herein:

> **MOTION:** MOTION TO SUPPRESS EVIDENCE (Doc. No. 52)
>
> **FILED:** October 16, 2013

**I. BACKGROUND.**

On June 12, 2013, a federal grand jury returned an Indictment charging Husein Kermali and Sikander Kermali with Conspiracy to Commit Theft of Government Property in violation of 18 U.S.C. § 371 (Count One); Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 (Count Two); and Wire Fraud in violation of 18 U.S.C. § 1343 (Counts Three through Eight). Doc. No. 25.

Husein Kermali filed the above-referenced motion to suppress from use at trial items seized from his residence at 3631 Pine Oak Trail, Sanford, Florida (hereinafter the "Subject Property") pursuant to a search warrant issued by a United States Magistrate Judge.  In sum, the motion argues that (1) the search warrant was overbroad and lacked the necessary particularity

regarding items to be searched for and seized; (2) that the search warrant affidavit did not provide a sufficient nexus between the Subject Property and the items to be searched for and seized; and, (3) that law enforcement agents seized items beyond the scope of the search warrant, specifically precious metals (including coins)[1] and firearms.  Doc. No. 52.[2]  The United States filed a response to the motion.  Doc. No. 58.  The motion was referred to me for issuance of a Report and Recommendation.  Doc. No. 53.

I held an evidentiary hearing on the motion on October 22, 2013.  Doc. No. 64.  At the beginning of the hearing, the United States conceded that Husein Kermali has standing to bring a motion to suppress as to items seized from the Subject Property.  *Id.* at 6.  The United States also indicated that items allegedly seized beyond the scope of the search warrant likely would not be introduced in the guilt phase of the trial but might be offered into evidence to establish property subject to forfeiture if Husein Kermali is convicted.  *Id.* at 4.  The United States does not contend that a motion to suppress is not applicable to evidence likely to be used only in the forfeiture stage of a criminal trial.

---

[1] The Court need not tarry long on defense counsel's arguments that coins are not precious metals.  Doc. No. 52 at 7.  The search warrant did not specifically authorize the seizure of precious metals; it authorized only seizure of documents reflecting the purchase, sale and the like of "any securities, certificates of deposit, or precious metals."  Doc. No. 52-2 at 4.  I will address below whether the seizure of precious metals (which I will define to include coins and other metals, such as cooper) was proper as fruits (proceeds) of the crime alleged.

[2] Husein Kermali also argued that the information in the search warrant affidavit was stale.  His lawyer withdrew this argument at the hearing.  Doc. No. 64 at 3.

A transcript of the evidentiary hearing has been prepared and filed.  Doc. No. 64. The motion is now ripe for resolution.

## II.     RELEVANT FACTS FROM THE SEARCH WARRANT AFFIDAVIT.

In November 2011, the Federal Bureau of Investigation ("FBI"), the Army Criminal Investigation Division ("CID"), and the General Services Administration ("GSA) and its Office of Inspector General ("OIG") began a joint investigation concerning the theft of government property and interstate transportation of stolen goods.  Doc. No. 52-1 ¶ 5.  The investigation revealed that while assigned to a U.S. Army Reserve unit, an individual who later became a confidential informant ("CI") made unauthorized purchases of goods on the Internet using the GSA Advantage Program and GSA Global Supply websites (collectively, the "GSA website").  The CI used Department of Defense Activity Account Codes, without authority to do so, to purchase these goods.  *Id.* ¶¶ 5, 7.  An audit of this activity revealed that the CI had directed that the fraudulently purchased goods be shipped to the CI's residence and to a warehouse located at 311 Specialty Point, Sanford, Florida (the "Warehouse"), discussed in more detail below.  *Id.* ¶¶ 3, 6, 11. Shipping records and GSA Advantage Program customer records show that deliveries to the Warehouse were signed for by H. Kermali, Tony Kermali, and another unidentified person.  *Id.* ¶ 11.

In December 2010, Husein Kermali contacted the CI regarding power tools that the CI had listed for sale on Craigslist.  The CI subsequently met with Husein Kermali and his brother, Sikander Kermali who used the name Tony.  *Id.* ¶ 9.  They discussed the Kermalis' interest in buying computer-related items that the CI could purchase through the GSA website at 15% of the price advertised for those goods on the website.  *Id.*

Thereafter, the Kermalis bought many goods that the CI fraudulently acquired via the GSA website. Ultimately, the CI began shipping the fraudulently acquired goods to the Warehouse, which was operated by NRK Distributors, Inc. ("NRK"). Husein Kermali is the registered agent and president of NRK, and the business address of record for NRK is the Subject Property. *Id.* ¶¶ 3, 9, 11, 13.

In December 2011, the CI began cooperating with law enforcement. *Id.* ¶ 7. Thereafter, the CI participated in an undercover operation through which he purchased specific goods requested by the Kermalis using covert funds supplied by the FBI and GSA. *Id.* ¶ 15. The CI communicated with the Kermalis verbally and in text messages using their respective cellular telephones. The CI also met with the Kermalis in person. *Id.* ¶¶ 15, 16. Husein Kermali also communicated with the CI through his email account, hkermali@me.com. *Id.* ¶¶ 17, 38.

On January 4, 2012, Husein Kermali sent an email to the CI requesting to purchase drill kits that the CI could obtain from the GSA website. *Id.* ¶ 17. On January 10, 2012, Tony Kermali requested to purchase printers that the CI could obtain from the GSA website. *Id.* ¶ 18. The CI, at the direction of law enforcement, purchased these items. *Id.* ¶ 19.

On January 26, 2012, the CI met with the Kermalis at the Warehouse to deliver the items the Kermalis had ordered. The meeting was surreptitiously recorded. *Id.* ¶ 22. While at the Warehouse, the CI observed two desktop computers, including one in the office of Husein Kermali. *Id.*

On February 28, 2012, the CI again met with the Kermalis at the Warehouse to deliver additional goods, including the power tool kits. The Kermalis paid the CI with a check drawn on the account of Kermali Investment, Inc. Kermali Investments, Inc. is a Florida corporation with

its address of record at the Subject Property. Husein Kermali is the President of Kermali Investments, Inc. *Id.* ¶ 25 & n. 15.

Thereafter, through April 12, 2012, the Kermalis continued to place orders for items with the CI, which the CI continued to fill. *Id.* ¶¶ 26-37. Among other things, the Kermalis purchased weapon lights and weapon sights. *Id.* ¶ 29 & nn. 16, 17.

In April 2012, the CI observed various guns at the Warehouse contained in what appeared to be computer-laptop cases. *Id.* ¶ 33. Tony Kermali asked the CI if he could get armor-piercing ammunition. *Id.* ¶ 33.

On April 22, 2012, the CI met with Husein Kermali at a car wash located in Lake Mary, Florida to deliver weapon lights previously ordered. This car wash was managed by Husein Kermali and its principal address and mailing address are the Subject Property. *Id.* ¶ 36 & n. 18.

Records obtained from eBay and PayPal showed that the Kermalis sold the items acquired from the CI on those websites under seller identifications LUVMYLEX and MICROTECHDIST. The accounts were administered using the email account hkermali@microdist.com, among others, and were associated with the email account hkermali@me.com. *Id.* ¶¶ 55-58. Records show that buyers on LUVMYFLEX sent 394 messages to the email hkermali@microdist.com from December 2010 to February 2012. *Id.* ¶ 56. Subpoenas revealed that the IP address 97.104.79.110 was used to access these accounts more than 100 times between August 2011 and February 2012. IP address 97.104.79.110 was associated with the Subject Property, and the screen name of the user was HKermali. *Id.* ¶¶ 56, 57. As of May 3, 2012, LUVMYLEX and MICRTECHDIST still had open accounts and LUVMYLEX was then continuing to sell goods. *Id.* ¶ 58.

The Kermalis also sold items acquired from the CI on TradeKey.com using the name NRK Distributors, Inc. Husein Kermali was listed as the manager on the website using the address of the Warehouse. *Id.* ¶ 61.

PayPal records showed that the money the Kermalis obtained though sale of items obtained from the CI were electronically transferred to bank accounts that the Kermalis owned or controlled. *Id.* ¶ 59. The Kermalis paid the CI through checks drawn on accounts with the payor being MicroTech Distribution, Inc. and Kermali Investments, Inc. *Id.* ¶¶ 22, 25.

## III.  THE SEARCH WARRANT.

The United States sought a search warrant for the Subject Property to seek records, including electronically stored information ("ESI"). *Id.* ¶ 64. The search warrant affidavit contemplated that computers and other electronic storage media might have to be seized for off-site review and, thereafter, be returned. *Id.* ¶¶ 68, 69, 70.

The search warrant authorized the United States to search for and seize the following:

Anything that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2314 (Interstate Transportation of Stolen Property) including:

a. Financial account statements or bank statements, including deposit slips, deposit books or ledgers, withdrawal slips, cleared checks, carbons of written checks, certificates of deposit, wire transfers, safe deposit boxes, and any other financial documents;

b. Any and all invoices and correspondence related to GSA, to include GSA Global Supply and GSA Advantage;

c. Any and all invoices, correspondence, and records related to customers and clients;

d. Any and all invoices, correspondence, and records related to dealers, wholesalers, sales representatives, and independent contractors;

    e.  Any and all invoices, correspondence, and records regarding any firearms, ammunition, and accessories [t]o include purchase, sale, trade, barter, negotiation, repair, licensing, shipping and receiving;

    f.  Any and all invoices, correspondence, and records reflecting the purchase, sale, trade, barter, negotiation, shipping and receiving of any securities, certificates of deposit, or precious metals;

    g.  Any and all records made in connection with purchase and/or sale of any real estate, including records which indicate the location of the property, dates of the real estate closing, the name of the parties to the real estate transactions, and the closing sheet or settlement statement/HUD-1 which reflects the source and distribution of the proceeds;

    h.  Any and all employment records to include current and former employees;

    I.  Any and all shipping records, to include invoices, shipments/deliveries received and/or sent, and shipping logs;

    j.  Any records or documents pertaining to the preparation, purchase, and acquisition of names or lists of names to be used in connection with the purchase, sale, trade, or transmission, through interstate commerce;

    k.  Electronically stored communications or messages reflecting computer on line chat sessions or email messages;

    l.  Any documents, records, programs, or applications that identify the residents of the residences and the businesses;

    m.  Any documents, records, programs or applications that identify the Internet service provided to the Premises and businesses[.]

Doc. No. 52-2 at 5.

**IV.     EXECUTION OF THE SEARCH WARRANT AT THE SUBJECT PROPERTY.**

Debra R. Weyrauch, an FBI Special Agent and the lead agent in the investigation of the CI and the Kermalis, testified at the suppression hearing. Doc. No. 64 at 7-8. Agent Weyrauch summarized the investigation leading to the issuance of the search warrant. Subpoenas had been served to obtain information about IP addresses and various companies associated with the activity under investigation and records from websites, including eBay and PayPal, through which the fraudulently acquired items were sold. *Id.* at 21-22. Subpoenas were also issued for bank records, and agents reviewed a lot of records related to the purchase of items through the GSA website. *Id.* at 20-21.

The search of the Subject Property began at about 6:45 a.m. on May 17, 2012. *Id.* at 10. Before entering the search site, every agent was briefed on the investigation and was required to have reviewed the search warrant affidavit and attachments. *Id.* at 30. Agents conducting the search should have had copies of the search warrant affidavit and attachments. *Id.*

Agents executing the search warrant located two safes within the Subject Property. Inside the safes they found gold bars, coins and other precious metals (collectively "precious metals"). *Id*. at 11-12. Firearms were found around both of the safes. *Id.* at 12. Additionally, agents found some computers, cell phones, and documentation. *Id.* at 11. *See generally* Doc. No. 52-3 (search warrant inventory).

During the investigation, law enforcement learned that the Kermalis were purchasing guns during the time period of the alleged conspiracy. *Id.* at 15. The agents did not seize 10 guns that Husein or Sikander Kermali identified as having been purchased before the time period of the alleged conspiracy. *Id.* at 15-16.

During the investigation, law enforcement also learned that Husein Kermali was purchasing precious metals during the time frame of the alleged conspiracy. *Id.* at 14-15. During an interview while the search was being conducted, Husein Kermali confirmed that he had purchased precious metals during the time frame of the alleged conspiracy. *Id.* at 14.[3] Husein Kermali asked to access his trading account online account to identify what precious metals he purchased before the time frame of the conspiracy, but there is no evidence that he was permitted to do so. *Id.* at 36. Agent Weyrauch testified that because Husein Kermali could not identify which precious metals he purchased before the time frame of the alleged conspiracy, all of the precious metals were seized as possible proceeds (fruits) of the crime. *Id.* at 23-24, 27, 31-32. This decision was made after consultation with Agent Weyrauch's supervisor, FBI legal counsel and an Assistant United States Attorney. *Id.* at 31. Agents did not seize cash and gift cards found in the Subject Property because Husein Kermali stated that these items were not related to his dealings with the CI. *Id.* at 16.

Subsequent investigation revealed that some of the precious metals seized were purchased before the time frame of the alleged conspiracy, but none of the precious metals had been returned to Husein Kermali as of the date of the hearing. *Id.* at 32-33.

**V.   ANALYSIS.**

---

[3] Follow-up investigation revealed that approximately $1,544,869.27 of precious metals were purchased during the time frame of the alleged conspiracy. *Id.* at 18. Neither the search warrant affidavit nor the hearing testimony established law enforcement's assessment at the time of the execution of the search warrant of the amount of money that Husein Kermali allegedly received as proceeds of the conspiracy.

Husein Kermali raises two grounds to suppress all of the items seized from the Subject Property: (1) that the search warrant was overbroad and did not specify with particularity the items to be seized; and, (2) that the search warrant lacked probable cause because it did not provide a nexus between his residence and shipping and real estate records, precious metals and firearms located there. He also argues that the firearms and precious metals seized during the execution of the search warrant must be suppressed because the seizure of these items exceeded the scope of the warrant.

The standard of review is whether, granting great deference to the decision of the issuing Magistrate Judge, the evidence contained in the affidavit viewed as a whole provided a substantial basis for the finding of probable cause. *See Mass. v. Upton*, 466 U.S. 727, 732-33 (1984); *see also United States v. Kilgore*, No. 1:11-cr-518-CAP-RGV, 2012 WL 5334298, at * 3-4 (N.D. Ga. Sept. 13, 2012).

A.   *Overbreadth and Particularity.*

"In order for a search to be reasonable, the warrant must be specific. Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *United States v. Maali*, 346 F. Supp. 2d 1226, 1239 (M.D. Fla. 2004) (citation and quotations omitted). "A description in a search warrant is sufficient and particular when 'it enables the searcher to reasonably ascertain and identify the things authorized to be seized' and prevents 'general, exploratory rummaging in a person's belongings.'" *United States v. Maharaj*, No. 07-80024-CR-CR, 2007 WL 2254559, at * 11 (S.D. Fla. Aug. 2, 2007) (quoting *United States v. Wuagneux*, 683 F.2d 1343, 1348-49 (11th Cir.1982)).

"A search warrant is overbroad and unconstitutional when it fails to 'sufficiently particularize' the place to be searched or 'the things to be seized.'" *Id.* ( quoting *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir.1985)).

Husein Kermali argues that Attachment B to the search warrant for the Subject Property is overbroad because it permitted law enforcement to search for and seize "[a]nything that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 2314 (Interstate Transportation of Sole Property) including [13 categories of items]." He submits that the reference to § 2314 is insufficient to link the items to be seized to fruits, evidence and instrumentalities of the crime described in the search warrant affidavit. He further argues that the list of categories of items to be seized is insufficient to meet the particularity requirement because "it was left to the agents to decide what was, and what was not, a 'fruit' or 'instrumentality' of the crime." Doc. No. 52 at 4.

Defense counsel is correct that the Search and Seizure Warrant, Doc. No. 52-2, did not specifically incorporate the search warrant affidavit containing the facts of the investigation of the alleged violation of § 2314 by Husein Kermali. However, the search warrant affidavit provided ample probable cause to believe that Husein Kermali was engaged in interstate transportation of stolen property by acquiring items fraudulently obtained from the GSA website and then advertising and selling these stolen items in interstate commerce over the internet.

The United States presented evidence that each agent executing the search was briefed on the search to be conducted and had read the search warrant affidavit and attachments thereto. This is sufficient to establish that the agents executing the search warrant were adequately advised of the scope of the alleged crime underlying the search and of the items that constituted evidence,

fruits and instrumentalities of the crime. Courts have found that a defect in the breadth and particularity requirements in a search warrant may be cured by the searching agents reading and reviewing the search warrant affidavit and through pre-search agent briefings. *See Wuagneux*, 683 F.2d 1343, 1350-51 & n.6; *Maharaj*, 2007 WL 2254559, at * 12-13; *Maali*, 346 F. Supp. 2d at 1243.

Furthermore, "[i]t is universally recognized that the particularity requirement must be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *Wuagneux*, 683 F.2d at 1349. In this case, the search warrant affidavit established probable cause to believe that the Kermalis used a number of business entities and locations to conduct their criminal activities and transferred the proceeds of the criminal activity to bank accounts owned or controlled by them. Therefore, the general description of categories of documents to be seized was as specific as possible considering the scope of the alleged criminal activity. *See Maali*, 346 F. Supp. 2d at 1239-42.

The "particularity" requirement with respect to authorization to search for and seize fruits and instrumentalities of the crime is also drawn as narrowly as could be expected and allowed the searching agents to reasonably ascertain and identify items within those categories. In *Wuagneux*, the Eleventh Circuit found that authorization to search for "property that constitutes evidence of the above-enumerated offenses, fruits of the crimes named-above and property which is or has

been used to commit the crimes enumerated herein" was sufficiently particular. 683 F.2d at 1350 n.5.[4]

For these reasons, Husein Kermali's first assignment of error is not well taken.

*B.     Insufficient Nexus Between The Place to Be Searched and the Items to Be Seized.*

Probable cause to search a residence requires some nexus between the premises and the alleged crime. *See United States v. Jenkins*, 901 F.2d 1075, 1080-81 (11th Cir.1990). The Eleventh Circuit has found that a law enforcement agent's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause. *United States v. Bradley*, 644 F.3d 1213, 1263-64 (11th Cir. 2011).

The search warrant affidavit established the requisite nexus between the alleged crime of interstate transportation of stolen property and the Subject Property. Businesses that sold the property fraudulently obtained from the GSA website and on which checks were drawn to pay for the property at issue used the Subject Property as their principal addresses. A computer located at the Subject Property was used in conjunction with the offering for sale and sale of the items fraudulently obtained from the GSA website.

---

[4] Even if this Court determines that the search warrant was overbroad or insufficiently particular in some respects, the search warrant did not authorize a wide-ranging, exploratory search. The search warrant affidavit presented more than conclusory assertions for consideration by the Magistrate Judge. There is no evidence that the agent who signed the affidavit or the agents who executed the search acted dishonestly or that the warrant was so overly broad on its fact that they could not have reasonably presumed it to be valid. Under these circumstances, the evidence seized should not be suppressed under the good faith exception to the exclusionary rule. *See, e.g., Travers*, 233 F.3d at 1331; *United States v. Rubinstein*, No. 09-20611-CR, 2010 WL 2723186, at * 10 (S.D. Fla. June 24, 2010); *United States v. Lebowitz*, 647 F. Supp. 2d 1336, 1354-55 (N.D. Ga. 2009) (and cases cited therein).

The search warrant affidavit presented probable cause to believe that shipping records would be found at the Subject Property. As noted above, the companies used to purchase and sell the items fraudulently obtained from the GSA website used the address of the Subject Property. Further, facts were presented that a computer at the Subject Property was used in the offering for sale and sale of the items fraudulently obtained from the GSA website. These facts provided reason to believe that records of shipments of the items sold would be sent to the shipping company's address of record either in paper to the physical address of the Subject Property or electronically to the computer involved in the transaction.

In contrast, the search warrant affidavit provides no probable cause to believe that records of real estate transactions and purchases of precious metals would be found at the Subject Property.[5] Nevertheless, these categories of items fall within the general authorization to search for fruits (proceeds) of the crime. The search warrant affidavit provided probable cause to believe that Husein Kermali obtained proceeds from the crime through sale of the stolen goods, as discussed in more detail below.

The search warrant inventory does not reflect that records of real estate transactions and records of purchases of precious metals were seized. Doc. No. 52-3. Because Husein Kermali has not established that any records of real estate transactions or records of purchases of precious metals were seized, there is nothing in these categories to suppress. *See United States v. Brown*, 374 F. App'x 927, 936-37 (11th Cir. 2010) ("The remedy for overbrea[d]th in a warrant is

---

[5] The search warrant did not include a specific authorization to search for records of firearm purchases or for precious metals or firearms. The seizure of firearms and precious metals will be discussed in more detail below.

severance but because none of the things seized were the result of [overbroad] language, severance is not warranted.").[6]

Therefore, this assignment of error is also not well taken.

*C.     Items Seized Beyond the Scope of the Warrant.*

Husein Kermali asserts that the agents seized items not authorized by the warrant, specifically precious metals and firearms. Agent Weyrauch testified that firearms and the precious metals were seized under the search warrant authorization to seize proceeds of the criminal activity. The search warrant affidavit provided probable cause to believe that Husein Kermali acquired proceeds from the criminal activity by selling the stolen items. Courts have found that it is reasonable to find that a person engaged in ongoing criminal activity might keep fruits of his crime in a place easy to access, such as his residence. *See, e.g., United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009).

As contemplated in *Wuagneux*, the searching agents used interviews of Husein Kermali and Sikander Kermali to identify what firearms and precious metals were likely to be proceeds of the criminal activity. When either Husein or Sikander Kermali identified items that were not purchased during the time of the alleged conspiracy, the identified items were not seized. The items left behind included 10 firearms, gift cards and cash. When items were identified as having been purchased during the time period of the alleged conspiracy, law enforcement items seized these items as proceeds of the alleged crime. Because Husein Kermali was not able to identify the type or amount of precious metals purchased during the alleged conspiracy, all of the precious

---

[6] If items under these categories were seized, the good faith exception would also apply. *See Kilgore*, 2012 WL 5334298, at * 7-9.

metals were seized as proceeds or commingled with proceeds of the alleged crime.[7] Thus, the evidence shows that the United States adequately investigated what were likely to be proceeds of the crime at the time of the search and seized only those items that it had probable cause to believe were proceeds or items so commingled with proceeds that the proceeds could not reasonably be separated from other items without difficulty.

For these reasons, the last assignment of error is also not well taken.

## VI. RECOMMENDATION.

For the reasons stated in the foregoing report, I respectfully recommend that the Court **DENY** the Motion to Suppress Evidence (Doc. No. 52).

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Orlando, Florida on this 27th day of November, 2013.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record
Unrepresented Parties
Courtroom Deputy

---

[7] During the hearing, Agent Weyrauch testified that the FBI has now determined that some of the precious metals seized were purchased before the time frame of the conspiracy. This may be a basis for Husein Kermali to file a motion for return of property under Fed. R. Crim. P. 41(g), but information learned by agents after the seizure of the property cannot be used to invalidate the seizure retroactively.